Your Honor, this is the first case of the morning. Call 209-282, Mark Thorne Ketthall v. Lasalle National Bank. This is trustee of the trust number 39201, Mark Dwyer. On behalf of the F.A.M.A., Mr. Patrick M. Canale. On behalf of the F.A.M.A., Mr. Alfred Y. Kirkland Jr. Good morning, counsel. Good morning. Mr. Canale. And please, the court. On behalf of my client, Bill Dwyer, who is president of court with his family, I want to thank the court for granting this opportunity to hear us orally with respect to the briefs that we've previously filed. Counsel, if I could ask you to address the microphone so it's pointed up towards your face a little bit more. Okay. Sorry. That's all right. Thank you. I'd like to read two statements. The first statement says as follows. We concluded that the Nottolines could not acquire riparian or littoral rights to the quarry because riparian or littoral rights do not extend to artificial bodies of water such as man-made lakes. Thus, Lasalle Bank and William Dwyer retained complete ownership rights in the quarry. Secondly, here plaintiffs are not raising any riparian rights claim. I did not make up these statements. These statements came from Justice Apollo when he entered his opinion in 2006 where the plaintiffs said to this court, we are not making any riparian rights claims with respect to a motion that we had filed with the trial court in which this court reversed and sent it back to the trial court for trial. When we went back to the trial court and tried this case in August 2008, there were 10 counts before the court and there were 12 plaintiffs. No riparian rights claim was ever tried in the trial court. And the reason it wasn't tried in the trial court in this particular case is because the trial judge had already ruled that your opinion in Nottoline that this particular quarry was an artificial body of water and was owned by my client, William Dwyer, was the law of the case. Well, this is not the same case, though. It is the same case. This case is the same case as that one? It's not the same case. What I'm saying, Judge, is… So then how can law of the case apply? The law of the case is that with respect to this particular body of water, you have already ruled that my client is the sole owner of this particular lot. He privately owns this particular lot and that he can drain this quarry if he wants to. But now the lot and the quarry are not coextensive, are they, counsel? They are. How are they coextensive? Lot 55 and the quarry are the same piece of property. And what evidence in the record is there to demonstrate that? Well, first of all, evidence in the record is that you've already held that lot 55 is the same as the quarry in the first Nottoline opinion. There was a holding to that? In this particular case, we presented evidence through a surveyor, Mr. Cohn. This is in the record. And after Nottoline was originally filed in 2003, he came out and did a survey with respect to this particular lot and confirmed what you had already held, and that is that my client is the sole owner of lot 55. Excuse me. That is not the same thing as saying that lot 55 is coextensive with the quarry, is it, counsel? No, absolutely it is. It is? And explain how, please. Because if you look at the survey that was done by Mr. Cohn, you will see that lot 55 is the quarry. There are portions of the quarry that may, with respect to its rising and lowering, go on to other people's property. But the quarry itself is lot 55. There is no doubt about that, and that is in the record. There is nothing in this case to indicate that any of the plaintiffs in this particular matter own any part of lot 55. The only thing that was tried in the trial court with respect to this particular case was implied easement claims, prescriptive easement claims, and other theories that they brought before the court. The issue with respect to their ownership in the quarry was never tried. And the reason that it wasn't tried is because there was no evidence, Judge, in this particular case that they owned any part of the quarry bed. Turning for a minute, Counsel, to the trial courts allowing the plaintiffs to amend their complaint after the trial to include count 9 based on Alderson. Okay. Nowhere in the record is there any objection on the part of, on your part, on behalf of your client to that amendment. Is there? Absolutely there is. There is? Absolutely. And can you describe where that appears? Well, here's what happened. The case got tried in August. The judge told us to submit findings of fact and conclusions of law, which we did. I did. The plaintiffs did not do that. They filed a motion to vacate the dismissal of count 9. Right. And they also sought to add this Alderson theory, which Justice Burke had issued approximately a month after that. When they filed that, I objected to that. I filed a motion in response to that. A motion to do what? To say that they shouldn't be able to amend the case because we had already tried the case. We responded to that motion and Judge Cowbell... Is there a written motion to that effect in the record? Absolutely there is. Absolutely there is. And I responded to it and Judge Cowbell said at that time, and I'm sure my colleague here will confirm that, at that particular time that he was going to take that motion with the case and then later on he did rule in February 2009 and ruled for the plaintiffs. The point of the matter, I'd like to say this about Alderson. First of all, Alderson is interesting not because of the artificial become natural rule, but because of the holding in the case. The holding in the case basically says even though the Aldersons, who owned a sliver of the quarry bed with respect to that particular artificial body of water, could not recover. And the reason the court said they could not recover was because they could not show the type of use that Justice Burke indicated was necessary for them to be able to prevail. And in that instance, what the court said was that the Aldersons had to show 40 to 50 years of uncontested use. And isn't that the case here? No. Why not? Two reasons. Three reasons. Number one, first of all, there is not anything in this record that shows the plaintiffs have any interest in lot 55. They have no paper. They have no document that indicates it. Let me just finish, Judge. Number two, in Alderson, there was a zoning restriction that had already been put in place that that particular lake had been dedicated for recreational use. All right. And with respect to that, there was no dispute that it was for recreational purposes. In fact, a conservation easement had even been oppressed. In our case, there is contested use. And the contested use is admitted by the plaintiffs in their verified complaint. For the last 40 years, they indicated that my client had contested the use of every plaintiff to use that property. And the only thing that they could use, the only use they could have of the property is with his permission. And now did he not, he promulgated, he tried to promulgate some rules and regulations. Absolutely he did. He put up other obstacles. Excuse me, counsel. I'm sorry. And yet, despite all of that, there was continued use by the plaintiffs of the quarry for swimming purposes. With his permission. They can't have a permissive use under any easement theory or even under Justice Burke's theory, which she doesn't define. And giving her credit, she says, we don't try to define this with any certainty here. A permissive use can never ripen into a right to use. And that's what she said. Let me just, I'd like to quote something if I could, Judge. She said as follows. The key, she stated, was that the indication of the rule, artificial becomes natural rule, is only appropriate where a person has relied upon the use of the artificial body of water without dispute. In this case, it's clear there has been a dispute. And she says something else is very important. She says, an artificial body of water, as Justice Burke said, is not a natural resource to be shared by all. As a general rule, this is that slip of pen on page 18, it would be inequitable to grant a property owner rights to an artificial body of water that has been created by someone else solely because the property abuts the water. That's what she said. And that's what their claim is here, Judge. There is nothing in this record that indicates in any conveyance that any plaintiff has that they have an interest in Lot 55 or the quarry. Now, let me just ask another question then. Sure. Now, if the quarry does extend outside of Lot 55, and the survey seems to indicate that it does, of what relevance is the fact that the defendants own Lot 55 to the issue of whether or not the plaintiffs own a portion of the quarry bed? The relevance is that Beecham tells us that if they want to use the surface waters, the reasonable use of the surface waters, then they must show they own some interest in the bed of that particular body of water. They can't do that. Merely because water happens to go on their property, that does not give them any right to somehow claim that they adversely possess Lot 55. Hasn't the water gone so far as to denude portions of the land? It may have. And therefore, does that not become part of the quarry bed? No, it does not. And that's what Nottolini held. Nottolini held that was Mr. Nottolini's claim originally. In this particular case, Counsel, could I ask a question? Sure. I thought that this property was sold with the idea that people who bought lots around Lot 55 would have access to the quarry slash lake. Well, I would say that prior to 1934, when the trust was established with respect to this particular property, that was the idea, Judge. That's not what happened. The Depression came along and the trust was terminated. Judge Cowell indicated the trust was terminated. And the reason that that was significant in this case is because if, in fact, the plaintiffs were going to prove an implied easement, they had to show prior use prior to that termination date, which they couldn't do. The only way they could do that in this case is through Ms. Tom, her evidence deposition, which is in the record. And all she did was testify that she swam there as a girl, a young girl, when she came out from Chicago. She couldn't even say that she swam in that particular quarry because there was another quarry at that time and also the Fox River where she lived. And on top of it, her, the use of the quarry by her was not permanent, was not continuous, and therefore the implied easement failed. So with respect to, I think, originally, Judge, that's what they wanted to do here. But as I indicated in my opening brief, the reason that it failed, I mean, the whole thing failed. In fact, if you go back and look at the original trust, lot 55, which was the quarry, was not to be sold. Well, it was sold in 1941. So even if the trust did not terminate or did not sever the title from the down of the Serbian estate, clearly in 1941 it did. What's the assessed valuation of the quarry, lot 55? Pardon me? What's the assessed value that the town assessor placed on lot 55? I couldn't tell you that, Judge. I don't know. I'm sorry. I just don't know that fact. I will tell you this, though. Isn't it at least 10 acres? No, it's not that big. It's nothing like the situation where you had in Lake Zurich with the Beecham case, which is a 240-acre parcel. What about the fact that one of the lots, I thought, was designated as a public access at one point? At one point it was indicated by that particular lot zone by my client. But at one point it was dedicated or indicated as a public access before your client bought it. I don't know if it was indicated as a public access. I think the lot, and I think you're speaking of lot 24 at that particular time, was the one that indicated that's where people used to access the quarry. And merely because someone made something available so people can access the quarry doesn't mean that somehow that comes into a right, Judge. Well, what were they accessing the quarry for? To swim. Absolutely. And so that was prior to your client's ownership. It was prior to my client's ownership. His father had leased that quarry for 20 years during that period of time, going back to 1948. But there were people accessing the quarry through that, whether they were going to swim or not. They were accessing the water in some way through that location. They were accessing the quarry. And, in fact, one of the people that accessed the quarry drowned and died in the quarry. I understand that. But the point here is usage. You said they can't establish any usage. Well, there's a person who drowned. That's a usage. That's a usage, but that doesn't mean because one person was a trespasser and came on the property that they have some, that somehow that. Well, what indicated that they were a trespasser? Were there signs posted? Absolutely we posted signs, no trespassing. There was a gate that prevented anybody from going through? There's testimony in the record that one of the residents at the request of my client put up a fence with respect to the fact that people could not come through, Judge. I wasn't so sure it was at the request of your client as it was at the, in opposition to something your client was doing. But I suppose that's subject to interpretation. I think he requested that a fence be erected so people could not access the quarry. She probably didn't want him to do that, but that's what he did. All right. Counsel, you'll have additional time on rebuttal to complete your argument. I want to say one other thing. Counsel, you will have additional time on rebuttal to complete your argument. Oh, I'm sorry. You're not finished. Thank you. Appreciate it. Okay. Thank you. Good morning. Good morning. This case, insofar as the Alderson case is concerned, I think presents a perfect story. I think Justice McClaren's observation is the appropriate place to begin because the very purpose of this subdivision, the very purpose of laying it out the way it was laid out, was in order to sell waterfront lots. And you saw that in the 20s they were advertising in the newspapers and there was actually a higher price for your waterfront lots. And you saw in the exhibits from back then a glossy brochure saying that when you buy property in the Fox River Beach subdivision, you automatically get rights in the quarry. And they talk about swimming and fishing and boating and skating and things of that nature. Mr. Kirkland, were those grand ideas, though, defeated by the fact that we don't have anything recorded such as easements or covenants or things of that nature that recognize that through subsequent owners? I don't think it is. It certainly isn't under Alderson. And I don't think it is under the other cases either. One of the reasons is that the trust, the trust is really the charter for the property, contains a provision that says that lot 55 is for the benefit of the entire subdivision, will never be sold and so on. But it was. Well, yes, but the circumstances of that are as follows. Paul and Elsa Frocher were the folks who owned the property with the Cacharellas. They put it into the trust. So it was their concept that this was going to be a subdivision where the folks who bought these lots, the ones that my clients have, would have the right to use the body of water known as the quarry in its largest sense, defined on the plaque as lot 55, also called the manless swimming pool. The property was not sold, lot 55, until 1941, I believe, or 42, could have been 43. It was sold to Frocher's cousin, who then turned around and sold it back shortly thereafter. The trial judge who, Judge Colwell, who took all the evidence in in context, said there wasn't an issue even as to whether or not there had been continuous use since the 1920s consistent with what the original idea had been. Now, I contend that there are two uses that are relevant here, because when this property was being sold, of course, the owner of the property was using one part of the property, lot 55, to attract buyers for the other part of the property, the subdivision lots. That continued until a time that is really indeterminate. But what did continue on, according to all the evidences, is the folks bought the lots. They used the quarry for recreational purposes. And as the judge pointed out, Judge Colwell, there isn't any evidence at all that this body of water was ever used for anything else, or any evidence that it was ever not used for recreational purposes. But, Counsel, I'd like to ask, why don't defendants' actions of distributing rules and regulations, disallowing certain people from using the quarry, and requesting removal of certain items from the quarry, demonstrate that plaintiff's use of the quarry was contested? You have to focus, Your Honor, on the plaintiff's use of the quarry. The first time that the plaintiff's use of the quarry was contested was in 2003, when Mr. Dwyer took to my clients an agreement that essentially asked them to abandon all rights in the quarry, all rights to use the quarry, and asked them to concede that, which is not a fact, that they had been using it permissively. And all of my clients denied that they were using it permissively. That's a fact on which I don't think there's any evidence in the record that you will find that there was some permission granted, Your Honor. Do you agree with Mr. Connelly's interpretation or recollection of what transpired relative to your attempt to amend Count 9? Well, I think what happened is I filed a motion to amend Count 9, and Judge Colwell said he was going to take those with the case. What Mr. Connelly never did was to say, no, keep in mind the background of this is that when the Alderson case became a live issue, I asked to, you know, to hold things up and wait and let's let Alderson be decided because Alderson may well control this case. Mr. Connelly objected to that, and he prevailed. When I made my motion for, you know, permission to amend and to bring in the Alderson case after the Supreme Court had really set the table in terms of what the law is here, which I predicted they would do, Mr. Connelly never asked for reopened proofs, never suggested any pleading, here are the, what do I want to say, the disadvantages that we suffer because of this. There was never a suggestion that there was anything else they would or could do in response to that, the Alderson case. Basically, the proofs in this case are the proofs you would put in the Alderson case if you started from the beginning. But the Alderson case really wasn't a known entity until we were in the trial, kind of. It sounded like what you just said was Mr. Connelly objected to postponing the trial until after Alderson. Yes. However, did he object to your attempt to amend or include Alderson in the consideration of the case? You know. Because he said he did. I know he said he did. I sat and listened to that. And as I'm standing here now, Your Honors, he said he did. You know, I'm unfortunately unable to tell you one way or the other. So that's just a failing of my memory. I just can't respond to that. So the use of the property comes down, you know, through the time right to the present day. A couple of issues that were mentioned I want to talk about. There's a suggestion that there's some kind of admission in Paragraph 74. Paragraph 74 doesn't say that from time to time Mr. Dwyer contested our use of the quarry. In fact, he didn't. But from time to time he took actions that would suggest that he had such a view. And, of course, the definition of suggest isn't to contest. It's a different definition. And actions he took, beginning with the Natalini case action, suggested except he never told our clients their rights weren't as they had always been. That, I'd say, first came up in 2003. Did you represent Natalini? I did not represent Natalini. Were you involved in the Natalini case in any way, shape, or form? In absolutely no way, shape, or form. You've heard the argument by Mr. Finale that this is law of the case. Have you ever heard law of the case apply to someone who wasn't part of the case? I have not, and I don't recall in the briefs any case suggesting that there was a law of the case application here. I could be wrong, but I don't recall that. And it would be, I think, an odd thing. I mean, the real problem here, of course, as we can see because the record has been developed now, is that Mr. Natalini owned a lot on which he could not put a residence. He didn't have the time then to raise the issue of the prescriptive easement. And so my client's rights and the issues that are inherent in my client's rights, who have lived for decades on this quarry and used it, were never, they were never presented. And as I said in the briefs, Rule 2406 or Section 2406 would have allowed Mr. Dwyer, had he thought it appropriate, to bring in all the property owners. He decided tactically not to do that. Well, counsel, in your cross-appeal, you do argue that the trial court erred in granting judgment in favor of the defendants on, I think, all of these counts except, I think, counts 1, 2, 3, 4, 5, 6, 7, and 10. Yes. Now, if this court concludes that the trial court was correct in granting you judgment on count 9, what purpose would be served by our reviewing the trial court's decision on those counts in your cross-appeal? I think the answer is if your Honor concludes, your honors conclude, that we are entitled to relief based on count 9, there's no purpose to go beyond that. Okay. And her problem is, obviously, I'm unable to anticipate. Okay. I have another question. Yes. One of the reasons that we've previously determined that Natalini was not raised judicata to the present case was lack of identity of the causes of action that is in Natalini. There were riparian rights sought while the plaintiffs in the case then did not. Now, under Alderson, the plaintiffs do seek riparian rights in the quarry. How does that change whether Natalini is raised judicata to this case? I don't think it changes it at all, your Honor. The issue, I think, that carried the day in the Natalini case was the issue I just suggested, and that is that there was nobody in a position to represent my client's interests. There just wasn't a situation. So you're saying there was no identity of parties? I'm saying there's no identity of interest. Obviously, there was no identity of parties. Or no privity. But the issue was that there was nobody to raise any of these things. There was nobody to raise implied easement or prescriptive easement. There just wasn't a person with the motivation, a person who could advance their own cause by representing our cause. And I think that is the basis upon which the Bedrock basis upon which the Natalini no-raise-judicata decision turned. I understand Alderson came up later. I'm not the engineer of history. It's just the way it happened when Alderson came up. Now, aren't the Quarry and Lot 55 coextensive? They are not. Why not? And what in the record shows they're not? Well, if you start out with Mr. Koh's testimony, who was the first, I think, witness in the case. I think it's 20 pages of testimony, so it's not too difficult. And he did a survey of the property, and he talked about his testimony. The fellow went out with a stick and everything. They did an actual survey, and they showed two things on the perimeter of the quarry. They showed the top of the bank, and then they had another line that showed the waterline. And if you follow those, the waterline goes on to my client's properties. And, in fact, I even, in his deposition, made a blue pencil, a blue line, told him I was going to ask him at trial, did ask him at trial. The bigger blowup, if you just follow the line, which I think is dash, two dots, dash, I think that's the waterline, you'll see that. I also tried to put into evidence an indication that on September 14, 2005, when this was done, we were at a low water ebb. I was unable to get what I wanted to get in on that. Well, what does water flowing over the bank have to do with ownership of the quarry bed? Well, it just shows that my clients, I mean, there were clients that owned, by other surveys, out 14, 15 feet into the water. So, I mean, I'm not sure I know how to respond to your question, or if I'm not getting what you wanted to get to, I obviously want to. Are you suggesting that the surveys that showed the, lots of the plaintiffs going into the water 15 feet meant that they had some title to the bed of the quarry? Yes, certainly. I mean, they own, they own everything that's under their lawn lines. I think that's standard law. I'm not aware that anybody has suggested that their lot lines weren't an indication of what they owned going right down to as far down as you can go. So, I don't, I mean, I can't. All the way to China, by any chance? I beg your pardon? All the way to China? Let's see, I really haven't figured that one out, Your Honor. Counsel, what bearing does the applicability of the Swimming Facility Act have on this case? I think it has absolutely none. That's a question for another day. In terms of the evidence on that, though, I forget the young fellow's name from the Department of Health, but he said, I had been told that the lot seven is where you have all the swimming and diving boards and things like that. I had been told that the public beach was lot seven and the entire body of water, and, therefore, I treated it like that. That's just not the ownership. That's not the real ownership. That ownership of the body of water is a shared ownership. But the other thing that is a fact is that since the 1970s, there hasn't been any public use anywhere on the quarry. In fact, the Dwyer property has been essentially a residential property. It has not been open for public use. So there is no public beach and hasn't been since the 1970s anywhere on the quarry. There just isn't any public beach issue. But I say further that if there's a public health issue, that's an issue for another day, and that will be handled in the course by the appropriate agency. But your clients or their predecessors couldn't be seen in that lake or on their piers or whatever after 1970? Your Honor, every lake, every lot on that body of water can see every other lot. So there's no – there's, I think, a picture of 130, I think, is the group of photographs. But every single lot owner can see every other lot owner. But they have used it for swimming. They have used it for recreation. Absolutely. And all have testified that way. And there has been no testimony that the older Mr. Dwyer, who in 1948 started leasing, and I'm going to describe that a little more fully, but the Lot 7 and the right to use Lot 55 around Lot 7 for his public swimming concession. I've forgotten what I was answering. For some reason I'm getting a little – Well, now I've forgotten what you were answering too. Okay. Well, let me see if I can just dredge it up here. They were using it for swimming. I asked, were they in fact using it for swimming? No, absolutely. They were using it for swimming. I guess what I wanted to point out is that there are two leases, Plaintiffs' Exhibits 129 and 18. They are not leases of the entirety of Lot 55. If you read those leases, that is not what they are. There was a public swimming concession at Lot 7. In order to conduct that, obviously, they had to use the waters of Lot 55 contiguous to Lot 7. But there's nothing to indicate in those contracts that there was a lease of the entire quarry. And, in fact, there were people who owned properties and had improvements on the properties going around the quarry. There's one incident that I recall from the briefs and record that Mr. Dwyer asked someone to get out of the water or to stop using it in such a way. Yes. Was that one of your clients or a guest of your client? It was one of my clients. I don't remember the precise date. It was Mr. Bellarmine and Mr. – and, frankly, I don't remember the date. My guess is it was around 2003, but the record will show whenever that was. And, of course, the one thing I would say is every single right that's an issue here by that time had vested. And I don't think if you roll over and are forceful enough and cause somebody to stop doing something in order to avoid a huge argument or a problem, that that trumps property rights that have been bought and paid for. But that's the only incident reflected in the record of someone from the family saying you can't use this. There might be offense put up, but nobody's been told to get out of the water other than Mr. Bellarmine? Yes. And if I'm allowed the time, I'll point out two other things. The trespassing signs were put up in 2005. Mr. Dwyer wrote over when Mr. Bohm was out erecting a pier in the quarry, and there was a discussion about don't put that on my property, and Mr. Bohm said I'm not putting it on your property. He's building a pier in the water. The point there being, I think, that Mr. Dwyer obviously understood what he did own and what he didn't own, and he didn't own or he didn't feel he owned the water in which the pier was being constructed. With respect to the rules, if you look at the documents that are relied upon as Mr. Dwyer promulgating rules, they are a communication signed by Mr. Dwyer and Ralph Tretto, another property owner. And of course, Mr. Dwyer is a property owner in addition to owning lot 55, or at least a half interest in it, the only half interest that we can find. But those, if you read those, those are not commands at all. Those are suggestions for, you know, they're offered as suggestions. They are all absolutely common sense. They are all exactly what you would do in the same circumstance. Thank you, counsel. I'll call you back. Mr. Connelly. Judge, you asked me before, where did I respond to the amendment by my colleague, Mr. Kirkland, to amend Count 9. If you look in my brief, my opening brief, you'll see that I filed a motion to dismiss the amended Count 9 on February 17, 2009. They responded to it. They also, the judge then denied it. And then later, I filed an answer to amended Count 9. It's on page C2226. Thank you, counsel. Justice McLaren, it's six acres, and that's how big lot 55 is. I don't know what the assessment is. I wanted to say something else about Almerson, though. First of all, Almerson did not overrule your decision in Nottolini. Almerson also has a second prong that Justice Burke indicated that is important, and she talks about fairness and equity. She indicated fairness and equity has to be considered with respect to whether or not an easement would be impressed, in this case, on my client's land. Now, we know from Almerson that the facts were that the use was uncontested. We also know the Almersons' loss because they couldn't show the uncontested use for 40 to 50 years. In this case, we know that the use of this has been contested, whether by permission or otherwise. We also know from the Leonard v. Pierce case, which is prior to the opinion in Beauchamp, that a property owner can withdraw his permission with respect to the use of his property at any time. We also know the following. We know that with respect to fairness and equity, the plaintiffs cannot have it one way. We are the ones who have to maintain this property. Could I interrupt and ask what you mean by they can't have it one way? Usually the cliché is you can't have it both ways. Okay. Well, the one way that I'm saying – Explain this new cliché to me. Okay. I'll be happy to do that. It's a windfall, one way. They get to use the property whenever they want. They don't have to maintain it. They don't have to insure it. They don't have to pay taxes on it. I think your cliché is they get their cake and eat it. Okay. That's fine. I stand corrected. The point of the matter is fairness and equity requires that there be some consideration to the landowner and his right to use his own property. In this particular case, if Justice Cowell's decision is to stand, then my client has no control over this property whatsoever. If you look at his decision, he says that the plaintiffs have the reasonable use of the surface waters, something that came from Beecham. Okay. And in this particular case, they don't own any part of the quarry bed. They are not entitled to the reasonable use under Beecham. Number two, under Alderson, they have not been able to show – you're right. They've showed use, but they have not been able to show uncontested use for 40 to 50 years. Here's another thing that – I didn't say 40 to 50. They have not been able to – none of the plaintiffs in this case were able to show that they had used this property or their predecessors. No. I mean, I think the law is a little more precise than 40 to 50 years. Is it 40 years or is it 50 years or is it 45 years relative to adverse possession or easement by prescription? No. You say 40 to 50. That's the language that Justice Burke used in her opinion, and she indicated in fairness to her that she did not try to define with any accuracy in the opinion whether it was 40 or 50 years. For adverse possession and prescription, it's clearly 20, Judge. In this particular case, in Alderson, she uses that language, 40 or 50 years, and she does not say we are trying to define it in that particular sense. Here's another thing she doesn't say. She doesn't say what the standard of proof is in Alderson. She doesn't tell us, like in a prescriptive easement or implied easement, we know it's clear and convincing evidence, okay? But in Alderson, she doesn't say that. All she says is that because it might be 40, it might be 50 of uncontested use, Alderson's lost. Did Justice Burke also say in Alderson that plaintiff hadn't established use? Not just uncontested or contested, but hadn't established use? Oh, no. She indicated that the plaintiff, since 1998, had established use because that particular body of water, Judge, was an artificial body of water that was used recreationally, and I believe the county or the local government authority had recognized that. But she indicated that the Aldersons had not shown the requisite time period for uncontested use, which, in her opinion, could be 40 or 50. Well, I think she used the term lengthy and just cited to two cases. That's true. Right. For example, one was 40 years and one was 50 years. She didn't herself put a time on it or a length of years, but just used the word lengthy. I think she used it in fairness. To be precise. Again, I think she used those as examples, Judge. That's really what she said. Mr. Canale, you indicated that the use needed to be long-term and uncontested. Yes. I would actually say it has not been, but I asked Mr. Kirkland what were the incidents where there was objection to the use, and he mentioned the no trespassing signs in 2005, the request for Mr. Bellamini to get out of the water at some point in time, and Mr. Bone not to put his peer in the water. If there has to be regular lengthy use, shouldn't there also be regular lengthy contest of that use? And I've only heard of three particular contests. Well, no. The record is replete before Judge Cowell with my client's testimony with respect to his attempts to regulate this particular body of water. His attempts to regulate, but did he ever get a court order? He went to the police department. Absolutely. And the police department did what? And they came out, and at one point, and Judge Cowell, in his opinion, indicated now we can no longer go to the police department to have people taken out of there. He did that on repeated occasions. So this isn't something that he did, you know, ad hoc. He did this repeatedly over the term that he owned this particular property. And I think if you look at the transcript, and I know you will, you'll see that the testimony was clear with respect to that. There's various things that he testified with respect to. Mr. Reuter, a tree fell in the quarry. He told him to get it out. Reuter got it out. There were other things with respect to that, Judge, over a long period of time. It was contested. There's no doubt about it. I think this litigation is probably a good testament to that. Thank you very much, Counsel. Thanks for your time, and thanks for letting me be here and hear my client's case. Thank you. At this time, the Court will take the matter under advisement and render a decision in due course.